We're going to go on to the fifth case of the day, NLRB v. Jam Productions, Limited. Thank you. Good morning, Mr. Garfield. May it please the Court, good morning. Good morning. I'm Garrett Garfield, representing the respondent employer in this case, Jam Productions. This is a vote-buying case where the NLRB unreasonably certified the results of a certification election and then followed that with an order that Jam bargained with the union. This Court should overturn both orders because in the months and the weeks leading up to the election, the union exercised its discretion to funnel disproportionate numbers of lucrative job referrals to a key block of voting employees. That was a grant of tangible economic benefits in the crucial period leading up to the election that compromised the laboratory conditions of the election and required that it be overturned. Mr. Garfield, what particularly was wrong with the way the two trends in the law got synthesized here? What was wrong with that? So I believe Your Honor is referring to what's on page 11 of the Board's decision talking about its reconciliation of certain hiring hall cases with the B&D plastics factors. Correct. There are two things wrong with that. First, the Board imposed an unprecedented burden on Jam where Jam would have to show not only that a benefit was granted in the critical period but also that the voters were not entitled to that benefit. That wasn't necessary here because B&D plastics already set out the framework for dealing with discretionary grants of benefits in the critical period and holds that when there is such a discretionary grant, then there is at least an inference of objectionable conduct. So the Board did not need to reconcile those cases to decide this case. Second, on the facts, Jam met that standard anyway because the evidence was clear here that the referrals were discretionary. The union admitted that and that no one was ever entitled to any referral from the system because the referrals were given solely in the Board's discretion, the union's discretion, excuse me. Now the evidence relied... Did you want to follow up? No. The evidence relied upon by the Board included evidence that the total number of referrals to the Riviera voters actually decreased sharply in the last three five-day periods before the election and increased again later in the summer following the election. Isn't that evidence that the referrals were not allocated as an inducement for the vote in the election? No, respectfully, Your Honor, it isn't. If I may back up briefly, the context of this case is that we were here in this court before and as Your Honor well knows, and at that point, the raw numbers of referrals were shown to have increased generally throughout the critical period. So the answer to the question is although the raw numbers were the smoke, but the real fire here was the disproportionality in the referrals that were granted to the voters as compared to others in the system. And this is in our brief on pages 17 through 21, and I don't want to belabor the numbers or the ratios themselves because the arithmetic itself is not at issue. But what I would like to emphasize is the point that the comparisons are not close. When we look at the different comparisons between voters, let's say voters who recently enrolled in the system and others who recently enrolled in the system, we see three and a half times as many referrals going to voters as to those comparators. If we compare, say, voters versus non-voters, we see three times as many referrals being directed to the voters during the critical period before the election. And that was one of the board's fundamental errors here was to ignore or to misconstrue that key numerical evidence. And the board did have the board's first response to that was to observe that the raw numbers of referrals to voters did generally rise and fall in tandem with the raw numbers of referrals being given out of the system generally. But the problem with that is that it misses the fact that the voters were getting a disproportionate share per person. This was not a case, in other words, where a rising tide lifted all boats equally. It was a case where the union exercised its discretion to ensure that some boats, the voters' boats, were lifted more than others. The other error that the board made or the failure to base its finding on substantial evidence is that even when it did engage with this evidence of disproportionality, it casually dismissed it. This is primarily on page 14 of the board's opinion, but it dismissed this evidence based on its own conjecture. For example, in one of the comparisons I just mentioned, the voters versus the non-voters, the board said, well, maybe it's the case that the voters had more experience and that could be the reason that they received more referrals. And the problem with that is evident on its face, and it is that there is no evidence to that effect in the record. The board's finding there was not based on the substantial evidence. The substantial evidence that was in the record was that the voters were in fact favored based on any comparison one wants to draw during that crucial six-week period leading up to the election in May of 2016. The numerical data was not the only evidence in the record either, and we cited in our brief some of the other points that bolster the conclusion that the union did exercise its discretion to target and favor the voters. One in particular where I respectfully request that the court direct its attention is to the evidence that the voters were referred to jobs in groups, not once or twice, 15 times during the relevant period. This highlights another one of the board's key errors or failures to base its finding on the substantial evidence because the board uncritically credited the union's testimony that it couldn't have favored the voters because it didn't know who they were. These numbers are in our brief, and I don't wish to put too fine a point on it, but that testimony is proved false by the fact that the voters were referred in groups to jobs. To any level of statistical certainty, that cannot have happened unless the union knew who the voters were and used that knowledge when making the referrals. Mr. Garfield, let me ask you to react to this. Are you sure you're not holding the board to a higher standard than the law does? I am sure of that. The reason I say that is because what you're doing is you're saying we have conducted a statistical analysis where we're focused on relative referral rates. That's the whole basis for the disproportionality points that you're making and that you made in your brief that way. But the hearing officer held a hearing, took tests, heard the account of Mr. Herman, and I think Mr. Carlson, but definitely Mr. Herman on this, and did look at this statistically, not with the rigor that you are advocating was required in a more elementary way with that trend line, chart A thing, table A. But under the substantial evidence standard, which is pretty deferential that way, why couldn't we conclude it was enough? They did enough on remand. Could they have done more or better? Perhaps, but they did enough. What's wrong with that? Your Honor, the reason that they didn't do enough is that their assessment of the evidence has to be reasonable. It is not reasonable to effectively disregard the statistical evidence and to give it no weight based on its own conjecture. I would respectfully direct the court's attention, for example, to the King Electric case where the court similarly had disregarded circumstantial evidence and also to the River City elevator case, which is a similar case involving a pre-election grant of benefit by a union. So I take your Honor's point. The standard is tough. River City did, in fact, call it a formidable burden, and yet still overturned. Still overturned because the union had granted a benefit to which the voters were not entitled. I see I'm very low on time. I'll request to reserve my remaining time unless there are further questions. Thank you. Mr. Seid. Good morning, Your Honor. Good morning. May it please the court, David Seid for the Labor Board. The board reasonably applied a two-step analysis in overturning Jam's election objection that referrals to the Riviera voters during the focal period, the six weeks prior to the election, was an impermissible benefit. First, the board found that referrals to nonmembers was not a new benefit and that Jam further failed to carry its burden of establishing that there was disproportionate referrals provided to the Riviera voters during the focal period. Under the second part of its analysis, the board determined that even if the referrals could be construed as a benefit, the union established that the referrals were due to workload, not the upcoming union election. Those conclusions are fully supported by substantial evidence, consistent with this court's remand, and consistent with other cases of the board and the courts. Now, Jam argued that the Riviera voters received twice the number of focal period referrals as other nonmembers, based on a total of 827 nonmember participants in Cole-Stewart. You argued that the number for comparison should only be the 334 nonmembers. Just quickly explain why that number is the proper comparator. Correct, Your Honor. So, essentially, Jam has tried to, or has alleged that the board erred in failing to draw certain inferences based on the referral numbers. And one of the referral numbers that it talks about is it compares the number of referrals that were received by the Jam voters during the focal period with all of the potential people who are participating in the hiring hall. However, it's not clear that all of these individuals were eligible for work at this time, or even seeking work at this time. And as the board's decision happily notes, Jam did not ask a single question to the union's witnesses about the people who did not receive or might not have received significant referrals, whether they were searching for work, whether they were even eligible at that particular time as far as being available for work. And so, in that context, the board very reasonably looked at the total of nonmembers who actually received referrals, rather than the entire list where it's clear from the evidence not everybody would have been available or even participating in the hiring hall. So, the broader conclusion you reach from that is that you say, well, Mr. Garfield, he's offered his proportionality analysis, but the proportionality analysis, it just doesn't hold up. It's not a situation where you say, well, I agree. They were getting referrals at the rate of two or three times as much. I mean, you're saying I'm not accepting the premise of it. That's correct, Your Honor, and I don't want to get too far into the weeds because it is covered in the board's brief. But another example, and was just referred to in the opening argument here, was that those who joined the hiring hall back in the fall of 2015 as nonmembers received fewer referrals than Jam voters who had also joined the hiring hall back in the fall of 2015. That number may actually be accurate, but again, it doesn't take into account, as the board's decision sets forth, were some of these people available for work at that time? Were they even seeking work at that time? And Jam did not ask, again, a single question to the union witnesses about this alleged disparity. And then, as the board's decision sets forth, if one looks at the Riviera voters who joined closer to the election, when compared to other nonmembers who became participants in the hiring hall closer to the election, the other nonmembers actually averaged more referrals than the Jam voters who became participants closer to the election. So that certainly raises doubt about Jam's numbers, and it was certainly not improper for the board to decline to draw the inferences that Jam insists the board should have made. You know, the board relied on testimony that the practice for union referrals involved the consideration of factors such as availability, experience, skills, and union membership. But is there any objective evidence that such factors were considered as part of the process, as opposed to resorting simply to whim or some sort of unfettered discretion? Your Honor, the testimony from Call Store Herman was consistent. It was repeated. Yes, there's discretion. It's a non-exclusive hiring hall. So by definition, there is discretion in a non-exclusive hiring hall. He was consistent in his testimony that both prior to and during the focal period, he considered the same factors, primarily availability, experience, skills, intending to favor union members and those with more experience. And in fact, the documentary evidence supports that at all times, whether viewed at Table A in a five-day period, whether viewed on a daily basis at the appendix pages 80 and 82. The union members received the most referrals, followed by nonmembers, with a very small percentage of those being the Riviera voters. And again, JAM's own documents, which can be found at appendix page 80 to 88, which sets forth when people started and the number of referrals they got. There are actually JAM non-voters who started in April. This is at page 87 of the record. There's two Alvarez's, a Bartolini, and a Buminis got 16, 10, 11 referrals, more than many of the JAM voters themselves. Those two individuals are non-voters? Those are Riviera non-voters. Then there's Jonathan Harvey, who's a non-member. Nothing to do at all with JAM. Starts on April 1st, six weeks before the election. He gets 27 referrals, more than any of the voters, in fact, I think more than any of the non-voters. So this all goes to show that this was a natural ebb and the flow. There were some major events going on in April, particularly the NFL draft. And as was earlier noted, right before the election, right when the union would be expected, boy, if we want to favor our potential voters, here's a time to do it. The referrals to those voters cratered. And then it dropped significantly after the election before picking up again and actually exceeding the focal period well into the summer, which supports, again, the overall finding that this was simply an ebb and a flow of work, that the spring was a busy time period, and then the summer picked up again, and that's when more referrals were seen to all types of voters, whether they were Riviera voters or non-voters or non-members that had nothing to do at all with Riviera. Unless this, unless this court has any further questions, the board would simply ask that the court enforce the board's order.  Thank you. Mr. Garfield. Thank you, Your Honor. I'll be very brief. The argument about ebb and flow of work is repeated in the briefs. It was repeated in the board's decision, but it does not answer the fundamental question of disproportionate treatment. It may answer the question of the raw number of referrals. It cannot account for the disproportionality. Can you speak on that point, Mr. Garfield? Can you speak to Mr. Seid's argument that, yeah, I hear you on disproportionality, but your measure is infirm, you know, within the pool of the hiring hall. Sure. This is the question of whether 827 should have been the denominator for our calculation. Yeah, because I think he's saying your proportionality analysis or the board's view of it is that it's not accounting for an important variable. A couple of responses to that. One, there's no evidence in the record as to which of those workers may or may not have been seeking work. The evidence that was in the record was that there were 827 other non-union members in the hiring hall. The other thing to consider here, which is important, is that the referral system is a zero-sum game. At every day, on every day during the critical period, there were more available stagehands than there were jobs. And that means for every single person, stagehand, who got a referral, some other stagehand did not. And that's the reason you have to count the ones who didn't get a referral to have a fair comparison when you're matching those numbers. Third response to that point is that the comparison between the voters and the other non-members was only one of the comparisons we drew. We drew others, and in every case, the disparities are stark. I would respectfully direct the court's attention to the disparity between voters and non-voters, five times as many during the eight-month lead-in and continuing three times as many during the focal period. Even if there's a little bit of noise in the data, the consistent disparities in all of the different comparisons are what reveal the problem here. Thank you. Thank you very much to both Mr. Garfield and Mr. Seib. The case will be taken under advisement.